FILED
10/31/23 11:52 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Bankruptcy No. 21-21903-JAD** |
| **STEPHEN F. D'ANGELO,** | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| ――――――――――――――――― | X | |
| | ) | |
| **PURLIN 4, LLC and PURLIN 5, LLC,** | ) | **Adversary No. 23-02076-JAD** |
| | ) | |
| | ) | **Related to ECF Nos. 1 and 11** |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| **REAL PROPERTY MORTGAGEE I, LLC, PETER FUSCALDO, JONATHAN SEIGEL, MATT McDONALD, VISTA DEVELOPMENT, LTD., PRONET CAPITAL, LLC, TCI TOSCANA, LP,** | ) | |
| | ) | |
| Defendants. | ) | |
| ――――――――――――――――― | X | |

## <u>MEMORANDUM OPINION</u>

In this removed action, Purlin 4, LLC ("<u>Purlin 4</u>") and Purlin 5, LLC ("<u>Purlin 5</u>," and collectively with Purlin 4, the "<u>Purlin Entities</u>") have filed an *Amended Verified Complaint* against the above captioned defendants (collectively, the "<u>Defendants</u>"), including Real Property Mortgagee I, LLC ("<u>RPMI</u>") and its sole owner Peter Fuscaldo, Esquire.

The question before the Court is whether this Court should remand this adversary proceeding to the Court of Common Pleas of Allegheny County, Pennsylvania due to, *inter alia*, jurisdictional defects and/or equitable reasons.

For the reasons set forth below, the Court finds that remand is proper because the Court lacks the requisite subject-matter jurisdiction to hear and decide this adversary proceeding. Remand is also proper because the equities support the remand of this lawsuit to the Court of Common Pleas of Allegheny County, Pennsylvania.

## I.

The *Amended Verified Complaint* contains 5 state law based causes of action, is 33 pages long, has 36 exhibits attached to it, and has 149 paragraphs of allegations.[1]

The *Amended Verified Complaint* filed by the Purlin Entities contends that Purlin 5 is the lawful owner of 100% of the membership interests in a Delaware limited liability company known as Turks Investment, LLC ("TIL"). According to the lawsuit, Purlin 5 allegedly acquired the TIL membership interests on or around June 26, 2023 by way of an assignment from its affiliate dck Worldwide

---

[1] In rendering this *Memorandum Opinion*, the Court has duly considered the allegations set forth in the *Amended Verified Complaint*, along with the record made in Mr. D'Angelo's bankruptcy case and related adversary proceedings. The Court's consideration of the entire record is appropriate given the competing factual assertions of the parties and because courts have held that the Court may consider "materials outside of the pleadings to resolve jurisdictional disputes, but cannot rely on conclusory or hearsay evidence." Lyn v. Transamerica Small Business Capital, Inc., 483 B.R. 440, 449 (Bankr. D. De. 2012)(quoting Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 72 (Bankr. S.D.N.Y. 2005)). As the United States Court of Appeals for the Third Circuit has held, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Int'l Assoc. Mach. & Aerosp. Workers, 673 F.2d 700, 711 (3rd Cir. 1982)(quoting Mortensen v. First Federal Savings and Loan Association, 549 F.2d 884, 891 (1977). In addition, Federal Rule of Evidence 201 allows a federal court to take judicial notice of the docket entries in a case and the contents of the court's record to determine the timing and status of case events, as well as facts not reasonably in dispute. In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa., Jan. 11, 1991); In re Meltzer, 516 B.R. 504, 506 n.2 (Bankr. N.D. Ill. 2014); SG & Co. Northeast, LLC v. Good, 461 B.R. 532, 535 n.3 (Bankr. N.D. Ill. 2011).

Group, LLC (formerly known as Purlin 2, LLC) ("Purlin 2").

Purlin 2 had previously acquired the membership interests in TIL on or about December 6, 2022 by way of a joint assignment from both Mr. Stephen D'Angelo (who is a reorganized debtor before this Court)[2] and his non-debtor wife (Mrs. Sharon D'Angelo).

In exchange for the assignment of the membership interests in TIL, Purlin 2 and its affiliates Arena SPV Limited, LLC and Arena Investors, L.P. (collectively, "Arena") agreed to (1) support confirmation of Mr. D'Angelo's *Amended Plan of Reorganization* dated May 4, 2022 and (2) withdraw or dismiss non-bankruptcy litigation filed in the Court of Common Pleas of Allegheny County, Pennsylvania styled as *Arena Investors, L.P. et al. v. Leech Tishman Fuscaldo & Lampl, LLC, et al.*, Civil Action G.D. No. 22-007973 (the "State Court Action").

The State Court Action had previously been commenced against each of Mrs. Sharon D'Angelo, certain of the dck Entities, and several of Mr. D'Angelo's

---

[2]  Mr. D'Angelo is and has been the controlling shareholder, president, and chief executive officer of dckWorldwide Holdings, Inc.  As Mr. D'Angelo describes it, "dckWorldwide Holdings, Inc. and its various wholly-owned subsidiaries (collectively, the "dck Entities") are a Pittsburgh, Pennsylvania based commercial builder and manager of large-scale, high-end construction projects throughout the United States and Caribbean." See *Debtor's First Amended Chapter 11 Plan Dated May 4, 2022* at p. 1.  The Purlin Entities have alleged that in 2017, well before the initiation of this bankruptcy proceeding, Mr. D'Angelo (with the assistance of Mrs. D'Angelo, Mr. Fuscaldo and Mr. Fuscaldo's law firm) improperly siphoned loan proceeds that the dck Entities obtained from Arena SPV Limited, LLC (which is an affiliate of the Purlin Entities).  The Purlin Entities allege that with these siphoned or diverted loan proceeds, Mr. D'Angelo entered into various unlawful "side deals."  One such "side-deal" was the establishment of TIL for the benefit of Mr. & Mrs. D'Angelo (and pledging of the same to Mr. Fuscaldo's entity RPMI). These transactions, and others, led to the commencement of the State Court Action (as such term is defined in the body of this *Memorandum Opinion*).  To avoid confusion, it should also be noted that dck Worldwide Group, LLC (f/k/a Purlin 2, LLC) is not a legacy dck Entity (as that term is defined above).  Rather, it is the Court's understanding that after the dck Entities defaulted on their obligations to Arena SPV Limited, LLC, this "Arena" creditor conducted a public foreclosure sale of the dck Entities.  At the sale, Arena SPV Limited, LLC's  affiliate, Purlin 2, LLC, was the successful purchaser.  After Purlin 2, LLC acquired the assets at the public foreclosure sale, Purlin 2, LLC changed its name to dck Worldwide Group, LLC.

business associates (including RPMI and Mr. Fuscaldo).  The withdrawal of the State Court Action was to be with prejudice as to claims against Mrs. D'Angelo only, and ***without prejudice*** as to claims against the remaining defendants.

The colloquy at the December 6, 2022 plan confirmation hearing before this Court plainly and unequivocally provides that the assignment of the membership interests in TIL to Purlin 2 was "subject to any existing claims or rights of third parties that may currently exist." <u>See</u> *December 6, 2022 Transcript* at p. 7.  RPMI, through legal counsel, was present at the December 6, 2022 confirmation hearing and did not oppose the contemplated transfer of the TIL interests "subject to" the claims or rights of third-parties that may exist.

Suffice it to say, there was no reference in the hearing record of December 6, 2022 that the transfer of the equity interests in TIL to Purlin 2 would be free and clear of any and all liens, claims or encumbrances of any third-party, whether by operation of agreement or pursuant to 11 U.S.C. §§ 363(f), 1123(a)(5)(D) and 1141(c).  In fact, the opposite is what was agreed to by the parties.  That is, the transfer of the TIL interests as part of plan confirmation was "subject to" the claims or rights of third-parties.

At the conclusion of the December 6, 2022 hearing, the Court instructed counsel to Mr. D'Angelo to submit a proposed confirmation order by "the end of the week" after "rounding the bases" with certain other parties-in-interest whose rights may also been affected by the transfer of the interests in TIL to Purlin 2. <u>See</u> *December 6, 2022 Transcript* at p. 21.   Counsel to the Debtor did so, and

submitted a proposed confirmation order under certification of counsel on December 12, 2022. <u>See</u> ECF No. 585.

Immediately after the proposed confirmation order was filed,  RPMI filed with the Court a document titled as a *Reservation of Rights to Consented Order Confirming Debtor's First Amended Chapter 11 Plan of Reorganization Dated May 4, 2022*, ECF No. 586 (the "<u>Reservation of Rights</u>").  The Reservation of Rights contains garden variety language to the effect that "all of [RPMI's] current and future rights, defenses and claims and counterclaims are unaffected and unimpaired" by entry of the confirmation order. <u>Id</u>.

Given the record described above, and given the fact that the Reservation of Rights filed by RPMI was consistent with the colloquy held at the December 6, 2022 hearing on confirmation of the Amended Plan, the Court entered its *Order Confirming Debtor's First Amended Chapter 11 Plan of Reorganization Dated May 4, 2022*, ECF No. 587 (the "<u>Confirmation Order</u>") on December 13, 3022.  The Confirmation Order states, in pertinent part, as follows:

> An agreement was set forth on the record at the confirmation hearing held on December 6, 2022 by and between certain parties and the Debtor (the "<u>Agreement</u>") and the Agreement is binding and enforceable on all creditors and parties in interest.  The Agreement shall survive any subsequent conversion or dismissal of this Case.  The parties shall act accordingly to implement the terms of the Agreement in the most expeditious and commercially reasonable manner possible.

<u>Id</u>. at para. 13.

After the entry of the Confirmation Order, Mr. & Mrs. D'Angelo formally

executed an assignment agreement on February 23, 2023 whereby they assigned 100% of the equity in TIL to  dck Worldwide Group, LLC (formerly known as Purlin 2, LLC), and the assignment agreement stated it was "effective as of December 6, 2022."[3]

The Purlin Entities contend that after Purlin 2 acquired the equity interests in TIL, Purlin 2 engaged in certain "corporate hygiene" to essentially re-constitute TIL.  That is, the TIL operating agreement was amended and restated; and the

---

[3] Because the assignment of the membership interests in TIL to Purlin 2 was an express term of confirmation of the *Amended Plan*, and because this agreement to transfer the TIL membership interests was expressly built into the Confirmation Order with the consent of RPMI, the Court need not wade into the mechanics as to how a membership interest in a limited liability company is assigned or otherwise transferred.  Regardless, the Court notes that the particular *Operating Agreement* in existence for TIL when the Confirmation Order was entered does not require the delivery of membership certificates as a condition of any transfer of the same. See *Amended Verified Complaint* at Exhibit 5, Article VII (ECF No. 24-5).  Additionally, courts have held that a "membership interest in a limited liability company is akin to an interest in stock of a corporation." Schwab v. Stroup (In re Stroup), 521 B.R. 84, 88 (Bankr. M.D. Pa. 2014)(discussing Pennsylvania law).  Courts have further held that, even in the context of Article 8 of the UCC, the "equitable transfer of corporate stock . . . does not abrogate the principle [allowing an] equitable transfer [of the corporate stock without actual delivery of the certificates] where rights of third parties would not be affected." Atlas Biologicals, Inc. v. Kutrubes, 474 F. Supp. 3d 1188, 1195 (D. Colo. 2020)(quotation marks omitted)(analyzing Colorado law).  Stated in other words, because principles of law and equity supplement the UCC, courts have recognized the concept of constructive delivery of equity interests. See, e.g., Kallop v. McAllister, 678 A.2d 526, 529-30 (Del. 1996)(examining Delaware law in existence at the time of decision).  As one court observed when addressing this issue in the context of applying the Texas version of Article 8 of the UCC:

> [T]he defendants argue that the Chapter 7 trustee failed to [establish the requisite ownership interest] because she could not produce a written stock certificate.  As an initial matter, Texas law of corporations and securities applies to this dispute because a corporation's rights are governed by the law of its state of incorporation.  Texas law has adopted Article 8 of the Uniform Commercial Code, which governs the creation and transfer of corporate securities.  Article 8 does not require a stock certificate to prove ownership of a company.  A stock certificate is not by itself stock in a corporation; it is merely evidence of ownership.  In fact, stock ownership "may, and often does, exist without" evidence of a certificate.  Rather, in order to create a stockholder relationship, a party must show an agreement giving the shareholder the ability to exercise a shareholder's rights.  Courts often imply such agreements or contracts from the parties' acts and the surrounding circumstances.

Musselman v. Jasgur (In re Seminole Walls & Ceilings Corp.), 446 B.R. 572, 585 (Bankr. M.D. Fla. 2011)(analyzing Texas law); accord Bakke v. Harvison, 417 S.W.3d 645, 650-51 (Tex. App.-El Paso 2013)(analyzing Texas law).

existing membership interests in TIL were cancelled and replaced with new member interests in favor of Purlin 2 (which were later allegedly assigned by Purlin 2 to Purlin 5).

The Purlin Entities further contend that as part of "corporate hygiene" Purlin 2 replaced Mr. D'Angelo as managing director of TIL with a person selected by Purlin 2 and that Purlin 4 infused $5.5 million of funding into TIL so that TIL could have the resources to invest into a real estate development project known as the "Turks & Caicos Project."[4]

With respect to the $5.5 million of funding into TIL, Purlin 4 is the current holder of a $5.5 million *Promissory Note and Security Agreement* dated June 23, 2023 with TIL as the maker or borrower. The obligations due Purlin 4 from TIL under *Promissory Note and Security Agreement* are secured against all of the assets of TIL. This security interest in favor of Purlin 4 was duly perfected by way of a financing statement filed on June 27, 2023, pursuant to Article 9 of the Uniform Commercial Code (the "UCC").

As collateral support for the $5.5 million loan from Purlin 4 to TIL, Purlin 5 also pledged its membership interests in TIL to Purlin 4. In connection with the same, Purlin 4 took possession of Purlin 5's membership interests in the re-constituted TIL on or about July 1, 2023. Purlin 4 also filed an Article 9 UCC

---

[4] Various exhibits attached to the Purlin Entities pleadings include emails which suggest that the land subject to the Turks & Caicos Project has an "as is" value of $26 million, and that the "as-completed" value of the real estate as a hotel as being $208 million (on a "Total Cost" of $187 million, thus representing "an equity gain at completion of $21 million"). See Exhibit A to *Plaintiff's Pre-Hearing Brief*, ECF No. 16-2.

financing statement on September 8, 2023, thereby putting the world on constructive notice of Purlin 4's perfected lien on all equity interests in TIL.

Pre-dating all of Purlin 2's and the Purlin Entities' transactions summarized above, Mr. D'Angelo filed for bankruptcy protection under chapter 11 on August 27, 2021 (the "Petition Date"). Among the creditors whom Mr. D'Angelo owed money as of the Petition Date was RPMI.

RPMI is wholly owned by Mr. Fuscaldo, and RPMI filed a secured proof of claim in this bankruptcy case asserting that Mr. D'Angelo (along with his wife) owed it $1,408,235.68. See Claim No. 24-1.

A copy of an *Amended and Restated Pledge Agreement* is attached to RPMI's proof of claim. Pursuant to this agreement, and on or about March 8, 2019, the D'Angelo's allegedly pledged their membership interests in TIL to RPMI as collateral for the D'Angelo's debt due to RPMI. In this regard, RPMI took possession of the certificates evidencing the D'Angelo's membership interests in TIL.

RPMI, however, never filed a UCC financing statement pursuant to Article 9 of the UCC.[5] Accordingly, there appears to be no genuine dispute that RPMI's

---

[5]   The Purlin Entities place much emphasis on the fact that RPMI's lien was, and is, un-perfected. The Purlin Entities fail to recognize that 13 Pa. C.S.A. §§ 9317(b)and 9317(d) provide that a "buyer" takes "free of a security interest" if the buyer "gives value" and closes on the transaction "without knowledge of the security interest" being asserted by a third-party. See Kibbe v. Rohde, 427 A.2d 1163, 1167-68 (Pa. Super. 1981)(explaining that a buyer takes subject to security interests when the buyer has actual knowledge of those interests); Keystone Data Sys., Inc. v. James F. Wild, Inc., 549 F. Supp. 790, 791 (E.D. Pa. 1982)(same). The record reflects that Arena and Purlin 2 had actual knowledge of the un-perfected lien interest of RPMI when Purlin 2 obtained an assignment of the TIL membership interests from Mr. & Mrs. D'Angelo. Numerous documents of record acknowledge as much. For example, paragraph 79 of the complaint filed by Arena and Purlin 2 in the State Court Action states: "The RPMI

(continued...)

lien and security interest in the TIL membership interests was not perfected[6] from an Article 9 perspective because: (1) the TIL certificates are not a "security" governed by Article 8 of the UCC because such equity interests are not "dealt or traded on securities exchanges or in securities markets[,]" see 13 Pa.C.S.A. § 8103(c); (2) the TIL certificates are not "investment property" subject to the permissive perfection by possession provisions of Article 9 because such collateral must be a "security" to even qualify for such provisions, see 13 Pa.C.S.A. §§ 9102(a), 9312, and 9313; and (3) absent an agreement that expressly provides for an "opt-in" of the TIL membership interests to Article 8 of the UCC, the TIL membership interests constitute "general intangibles" which Article 9 of the UCC requires perfection by way of the filing of a financing statement, see 13 Pa.C.S.A. § 9310(a) and Angel v. Faison (In re Faison), 518 B.R. 849, 858 (Bankr. E.D.N.C. 2014).[7]

---

[5](...continued)
Promissory Note was personally guaranteed by D'Angelo and secured by Stephen F. and Sharon A. D'Angelo's equity interests consisting of 100 shares of stock in TIL." See ECF No. 365-1, Exhibit A at para. 79. RPMI's lien interest in the TIL membership interests were also conspicuously stated in the Court approved Disclosure Statement that was circulated with the Amended Plan. See ECF No. 180-1 at p. 25. Arena and Purlin 2 further acknowledged the RPMI lien in their objection to a prior iteration of the Disclosure Statement. See ECF No. 160 at p. 3. There are other acknowledgments of record by Arena and Purlin 2, and the preceding merely highlights few of them.

[6] Despite the imperfection, any lien asserted by TIL was never avoided in Mr. D'Angelo's bankruptcy, and the time period by which the bankruptcy estate may do so has expired. See 11 U.S.C. § 546(a)(setting forth the time period by which a bankruptcy trustee or debtor-in-possession must commence actions under the so-called "strong-arm" powers of 11 U.S.C. § 544). At hearings held in connection with approval of Mr. D'Angelo's Disclosure Statement in support of his Amended Plan, counsel for Mr. D'Angelo represented to the Court that the estate had no avoidance actions under chapter 5 of the Bankruptcy Code. The Court finds this representation to be troublesome in light of the fact that RPMI's lien interest was obviously subject to potential avoidance since it was unperfected. See In re Faison, 518 B.R. 849, 858 (Bankr. E.D.N.C. 2014). (un-perfected lien against LLC membership interests are subject to avoidance by operation of the "strong-arm powers" of 11 U.S.C. § 544).

[7] The TIL Operating Agreement did not contain an express Article 8 "opt-in" when the TIL membership

(continued...)

After the assignment of the TIL membership interests to Purlin 2 (and after Purlin 2's purported further assignment of the TIL membership interests to Purlin 5 and closing of the Purlin 4 loan to TIL), the Purlin Entities allege that a parade of horribles occurred as a result of the alleged conduct of the Defendants.

The horribles alleged include RPMI and Mr. Fuscaldo, acting in concert with all or some of the other Defendants, depriving TIL of various redemption rights and/or liquidated payments originating from the Turks & Caicos Project, eliminating TIL's "second charge" or lien on the properties subject to the Turks &

---

[7](...continued)

interests were pledged to RPMI. The Purlin Entities contend that upon acquisition of the membership interests in TIL, Purlin 2 undertook "corporate hygiene" by, among other things, causing the TIL membership interests to "opt-in" to the coverage of Article 8 of the UCC. See *Amended Verified Complaint* at paras. 49-50. In support of this allegation, the Purlin Entities cite the *Amended and Restated Operating Agreement* of TIL, which is attached at Exhibit 3 to the *Amended Verified Complaint* (ECF No. 24-3). The Court has reviewed the *Amended and Restated Operating Agreement* and this document **does not** contain any provisions purporting to "opt-in" TIL to Article 8 of the UCC. The Court is perplexed as to why the Purlin Entities would make such a categorical allegation when the document they cite is lacking any basis for their contention. To effectively "opt-in" to Article 8 of the UCC, the TIL operating agreement should expressly provide that its membership interests are securities governed by Article 8. See Lynn A. Soukup, "Opting In" to Article 8-Limited Liability Company and Partnership Interests as Collateral, SH081 ALI-ABA 149, 151 (2003)(citing UCC 8-103(c)). The only reference to Article 8 of the UCC in the documents of record is set forth in paragraph 9 of the *Pledge Agreement* (effective July 1, 2023) between the Purlin Entities. See *Amended Verified Complaint* at Exhibit 7 (ECF No. 24-7). Paragraph 9 of the *Pledge Agreement* states:

> Irrevocable Authorization and Instructions. To the extent that any portion of the Pledges Collateral may now or hereafter consist of uncertificated securities within the meaning of Article 8 of the UCC, Pledgor [i.e., Purlin 5] irrevocably authorizes Issuer [i.e., TIL] to comply with any instruction received by Issuer from Holder [i.e., Purlin 4] with respect to the Pledged Collateral without any other or further instructions from or consent of Pledgor, and Pledgor agrees that issuer shall be fully protected in so complying; provided, however, that Holder agrees that it will not issue or deliver any such instructions except upon the occurrence of an Event of Default.

See *Pledge Agreement* at para. 9. This provision does not, on its face, purport to expressly "opt-in" the membership interests in TIL to Article 8 of the UCC. Compare *Pledge Agreement*, para. 9 with UCC Article 8 "opt-in" provisions recommended in the following sources: James D. Prendergast, Secured Real Estate Mezzanine Lending (With Form): There really is a right way to do it!, 23 No. 2 Prac. Real Est. Law. 35, 49 (March 2007)(appendix) and Amendment to LLC Agreement (Opting into Article 8), West law Practical Law Standard Document w-011-4604, https://www.westlaw.com/w-011-4604?view=hidealldraftingnotes&transitionType=Default&contextData= (sc.Default)&VR=3.0&RS=cblt1.0(last visited October 24, 2023)

Caicos Project, and otherwise usurping the economic value of the Turks & Caicos Project away from TIL (and therefore the Purlin Entities) and reposing such value in certain of the Defendants (including RPMI and Mr. Fuscaldo).[8]  The Purlin Entities essentially allege that all of these transactions were accomplished by RPMI (and Mr. Fuscaldo) acting *ultra vires*[9] on behalf of TIL without notice to, and/or the knowledge and consent of, the Purlin Entities.

The Purlin Entities further allege that after RPMI and Mr. Fuscaldo usurped the economic benefits due to TIL with respect to the Turks & Caicos Project, RPMI mailed a notice on July 18, 2023 advising Purlin 2 that RPMI intended to foreclose on its alleged pledged interest in TIL by way of private sale as soon as July 25, 2023– one week from the date of the notice.  RPMI did not direct its notice to Purlin 4 or Purlin 5.

RPMI's issuance of its notice of intent to foreclose occurred after it had filed

---

[8]  For example, the Purlin Entities allege that on July 17, 2023, redemption proceeds in the amount of $1.2 million have been remitted to the trust account of the law firm of Tucker Arensburg, P.C., which serves as legal counsel to RPMI and Mr. Fuscaldo.  See *Amended Verified Complaint* at para. 80.  A fair inference that can be gleaned from the *Amended Verified Complaint* is that the Purlin Entities are alleging that RPMI engaged in self-dealing and thus otherwise failed to use "reasonable care" to safeguard Purlin 2's (and/or Purlin 5's) interests in contravention of 13 Pa.C.S.A. § 9207 and any common-law duties that a pledgee may owe to a pledgor.  See, e.g., Empire Life Ins. Co.. of America v. Valdek Corp., 468 F.2d 330, 335 (5th Cir. 1972) (pledgee owes a duty to pledgor, and pledgee that intentionally and wrongfully depreciates value of pledged stock is liable to pledgor for injuries sustained).

[9]  The Purlin Entities appear to make this allegation with no analysis or consideration of the terms of the *Amended and Restated Pledge Agreement* between Mr. and Mrs. D'Angelo and RPMI.  The Court notes that, as a general matter, legal title to pledged equity does not pass from the pledgor to the pledgee when the equity interest is pledged. See, e.g., In re John Hicks Chrysler-Plymouth, Inc., 152 B.R. 503, 507-08 (Bankr. E.D. Tenn. 1992); Calaiaro v. Pittsburgh National Bank, 33 B.R. 288, 291 (Bankr. W.D. Pa. 1983).  Notwithstanding the fact that title does not pass, courts have held that a pledgee has the same right to protect its equitable interest in the collateral as does the pledgor. See, e.g., In re Pittsburgh & Lake Erie R.R. Secs. & Antitrust Litig., 543 F.2d 1058, 1067 (3rd Cir. 1976).  Whether RPMI has such rights, and whether it appropriately exercised them, is something for which this Court offers no opinion.

before this Court a motion titled *Motion Seeking Expedited Relief From Stay*. <u>See</u> ECF No. 641.  Pursuant to this motion, RPMI asserted its status as a lienholder of the pledged membership interests in TIL, and averred that relief was appropriate since RPMI's claim against Mr. D'Angelo had not been paid (and thus Mr. D'Angelo's default persisted despite confirmation of the *Amended Plan*).[10]

Mr. D'Angelo filed a response to the motion, averring that RPMI's motion related to membership interests in TIL which, pursuant to the assignments authorized by the confirmed *Amended Plan*, are "no longer property of the estate..." <u>See</u> *Response to Motion Seeking Expedited Relief From Stay* at para. 10, ECF No. 648.

Purlin 2 and Arena filed a joint objection and acknowledged that RPMI's motion for relief from stay concerned litigation as to "claims over [a] non-debtor, non-estate property" that had been "assigned in their entirety" to Purlin 2. <u>See</u> *Objection of Arena Limited SPV, LLC, Arena Investors, L.P. and dck Worldwide Group, LLC f/k/a Purlin 2, LLC to Motion of Real Property Mortgage I, LLC for Relief From Stay* (the "<u>Purlin Objection</u>") at paras. 11 and 26, ECF No. 647.

The objection of Purlin 2 and Arena also asserted the existence of an alleged agreement by RPMI to release its lien interest against the membership interests in TIL.  The alleged lien release agreement was entered into ***outside the purview***

---

[10]  Not only has the RPMI's claim not been paid in full, neither the *Amended Plan* nor the Confirmation Order provided for the curing or waiving any default with respect to RPMI pursuant to 11 U.S.C. § 1123(a)(5)(G). Rather, as expressly set forth in the colloquy at the December 6, 2022 confirmation hearing, the assignment of the membership interests in TIL was "subject to any existing claims or rights of third parties that may currently exist."

***of this Court***, and was allegedly entered into ***subsequent to confirmation*** of Mr.

D'Angelo's A*mended Plan*. See *Amended Verified Complaint* at para. 1, ECF No. 24.

According to Purlin 2 and Arena, "Arena . . . reached settlements-in-

principle with parties other than the debtor who were defendants in the State

Court Action, including Leech Tishman Fuscaldo and Lampl ("LTFL") and Mr.

Fuscaldo and RPM I." See Purlin Objection at para. 13.  In this regard, Purlin 2

and Arena averred "[b]ecause Arena's participation in this Bankruptcy Case at

large had concluded with the withdrawal of Arena's Objection to Plan

Confirmation (and the Court's entry of the Confirmation Order), the undersigned

counsel negotiated with LTFL Partner David Weicht, Esq., with regard to LTFL

itself, as well as RPM I and Mr. Fuscaldo personally." Id. at para. 14.  "For its part,

Arena agreed to voluntarily 'convert' its withdrawal of the State Court Action from

a 'without prejudice' dismissal to a 'with prejudice' dismissal[,] in exchange for

RPMI not "claiming a first lien on TIL and [RPMI] will remove any filed lien." Id. at

paras. 15 & 16.

RPMI, in-turn, filed a further "reply' to the Purlin Objection, where it

contended that the above described lien release agreement described by Purlin

and the Arena entities was never reached.  RPMI also acknowledged that because

the "membership interests [were] in essence abandoned [by Mr. D'Angelo] and

[are] not property of the estate," that relief from stay is appropriate. See *Reply to*

*Objections to RPM I's Motion for Relief From Stay and Relief Including Striking the*

*Response of Arena* at paras. 8-11, ECF No. 649.

Given the admissions of the parties, the Court entered an order dated July

10, 2023 granting relief from the automatic stay "so that RPMI may take all

actions it deems necessary and appropriate to enforce its rights under the Note

and under the Pledge Agreement with respect to the Pledged Membership Interest

[in TIL]." See Order dated July 10, 2023, ECF No. 650.

The July 10, 2023 Order further provides, in pertinent part, that:

> Movant [RPMI], Respondent [Mr. D'Angelo], and Arena
> have essentially acknowledged in their papers that the
> asset(s) in question are non-debtor and non-estate
> assets.    Thus, relief from any Bankruptcy stay is
> appropriate and no hearing is warranted given the
> admissions of record by the parties.  Nothing contained
> herein should be deemed or construed to be a finding,
> either positively or negatively, as to the nature and
> extent of any interest of the Movant [RPMI].  Rather, the
> stay is lifted so the Movant can proceed under applicable
> non-bankruptcy law with respect to whatever remedies
> it has as to the subject collateral.

Id.

On July 21, 2023, the Purlin Entities commenced this adversary proceeding

by filing a complaint in the Court of Common Pleas of Allegheny County at G.D.

No. 23-008954 (the "Removed Action"), whereby it sought a declaration of the

Purlin Entities' rights in TIL and to enjoin RPMI from foreclosing on its asserted

equity interest in TIL.[11]

While not a model of clarity, the Removed Action appears to make reference

---

[11]  On July 27, 2023, Purlin 4 also sent TIL a "Notice of Designated Events of Default and Notice of
Acceleration."  The Court can only assume that this was done to preserve rights of Purlin 4 under both the *Pledge
Agreement* executed by Purlin 5 in favor of Purlin 4 and the *Amended and Restated Promissory Note and Security
Agreement* by and between Purlin 4 and TIL.

to the alleged lien release agreement(s) which were previously alleged in the joint opposition filed by Purlin 2 and Arena to RPMI's motion for relief from stay. The Removed Action further appears to suggest that some sort of additional lien release agreement was negotiated around the time Purlin 2 and Arena settled a non-dischargeability action that was pending against Mr. D'Angelo before this Court in an action captioned as *Purlin 2, LLC et al. v. Stephen F. D'Angelo*, Adversary No. 21-21020-JAD (the "Nondischargeability Action").

In the Nondischargeability Action, Purlin 2 and Arena argued that Mr. D'Angelo had used the dck Entities as instrumentalities of fraud, and that all debts due Purlin 2 and/or Arena that were related to Mr. D'Angelo's control of the dck Entities should be non-dischargeable under 11 U.S.C. § 523(a)(2)(A)(excepting from discharge debts resulting from fraud) and 11 U.S.C. § 11 U.S.C. § 523(a)(6)(excepting from discharge debts for willful and malicious injury to persons or property).

By way of *Settlement Agreement and Mutual Release Agreement* dated May 24, 2023 (see Adversary No. 21-21020-JAD at ECF No. 91-1), which was approved in an *Order Approving Settlement Agreement* entered by this Court on June 16, 2023 (see Adversary No. 21-21020-JAD, ECF No. 96), each of Mr. D'Angelo, Purlin 2, and Arena agreed to resolve the Nondischargeability Action.

The terms of this settlement included dismissing the State Court Action with prejudice. However, the written agreement setting forth the terms of settlement of the Nondischargeability Action made absolutely zero reference(s) to RPMI. Nor

did any of the settlement documents filed with the Court discuss TIL, RPMI's lien interest against the membership interests in TIL, and/or the release of any lien interest that RPMI may have with respect to the pledged membership interests in TIL.

In addition, the *Motion for Order Approving Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* made no reference to RPMI, made no reference to TIL, made no reference to RPMI's lien interest against the membership interests in TIL, and made no reference to RPMI releasing any pledge it received from Mr. D'Angelo of any membership interests in TIL. See Adversary No. 21-2120-JAD, ECF No. 91.

The fact is, this Court never approved, and was never asked to approve, any settlement between any party which involved or provided for the release of any lien or pledge of TIL membership interests granted by the D'Angelo's to RPMI.  As such, if there is a release of lien agreement of any sort between RPMI and the Purlin Entities, such agreement is alleged to have been entered into ***after entry of the Confirmation Order*** and ***outside the purview of this Court and this bankruptcy case***.[12]

---

[12]  The Purlin Entities attach to the *Amended Verified Complaint* several emails which they contend are evidence of lien release agreements between the Purlin Entities and RPMI. As the Third Circuit has noted, "[s]ettlement agreements are nothing more than contracts, and therefore basic contract principals apply" to any determination as to whether dueling emails rise to the level of a contract. Cal. Sun Tanning USA, Inc. v. Elec. Beach, Inc., 369 Fed.Appx. 340, 346, n. 6 (3rd Cir.2010); see also Mazzella v. Koken, 559 Pa. 216, 224, 739 A.2d 531, 536 (1999) ("To be enforceable, a settlement agreement must possess all of the elements of a valid contract"). It is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement. Mazzella v. Koken, 559 Pa. at 224, 739 A.2d 531. If all of the material terms of a bargain are agreed upon, the settlement will be enforced if supported by consideration; but if

(continued...)

After the commencement of the litigation that is the subject of this Removed Action, the Honorable Christine A. Ward, Judge of the Court of Common Pleas of Allegheny County, held a July 25, 2023 telephonic status conference on the Removed Action with counsel for RPMI and the Purlin Entities.

According to the Purlin Entities, Judge Ward "indicated that she was away as chair of a judicial conference in Hershey, Pennsylvania and could not hold an evidentiary hearing on Plaintiffs' Emergency Motion [for a preliminary injunction] until August 1, 2023." See *Amended Verified Complaint* at para. 6.  The Purlin Entities contend that "Judge Ward instructed [RPMI and the Purlin Entities] to observe a standstill on any foreclosure until [Judge Ward] could conduct an evidentiary hearing and issue a ruling.  Counsel for [RPMI] requested that [the Purlin Entities] be required to post a bond, but Judge Ward rejected the request." Id.

On Saturday, July 29, 2023, and before there could be an evidentiary hearing before Judge Ward, RPMI then removed this action to the United States District Court for the Western District of Pennsylvania at Case No. 2:23-cv-01363.

In support of removal, RPMI alleged that the United States District Court for the Western District of Pennsylvania "has original jurisdiction over the [Removed

---

[12](...continued)
there exist ambiguities and undetermined matters which render a settlement agreement impossible to enforce, the settlement agreement will be set aside. Id. at 225, 739 A.2d 531.  As explained in Cal. Sun Tanning, which also involved a series of e-mails, "[i]t is by now axiomatic under Pennsylvania law that 'the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'" 369 Fed.Appx. at 346 (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298–99 (3rd Cir.1986)).

Action] under 28 U.S.C. § 1334(b) and RPMI may remove this action to this Court pursuant to 28 U.S.C. § 1452(a) because the [Removed Action] is "related to" a case under Title 11, namely [Mr. D'Angelo's] Bankruptcy Case.  See 28 U.S.C. § 157."  See *Notice of Removal* at para. 18, ECF No. 1.  RPMI further alleged in support of removal that "[a] bankruptcy court has jurisdiction to enforce its own approved orders and settlements. See, e.g., Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009)(a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders)." Id.

Immediately upon learning of the removal, counsel for the Purlin Entities sent RPMI's counsel at least 3 written communications seeking confirmation that RPMI was not proceeding to complete the private foreclosure sale in contravention of Judge Ward's alleged instructions.

Consistent with the adage that it's a "dog eat dog world," counsel for RPMI did not offer the assurances that counsel for the Purlin Entities requested. Instead, without any meaningful elaboration or particularized notice to the Purlin Entities, RPMI proceeded on July 31, 2023 to conduct a private Article 9 foreclosure sale of the collateralized membership interests it claimed to have held in TIL.

As evidenced by that certain *Bill of Sale* dated July 31, 2023, RPMI acquired the membership interests at the private sale by remitting a "credit bid in the amount of $10 and other good and valuable consideration." See Exhibit 33 to the *Amended Verified Complaint*, ECF No. 24-33.  This sale appears to have been

conducted in violation of 13 Pa.C.S.A. § 9610(c)(2), which limits the ability of a

secured party to purchase collateral at a "private disposition only if the collateral

is of a kind which is customarily sold on a recognized market or the subject of

widely distributed standard price quotations."[13]

The Purlin Entities have alleged that the private sale conducted by RPMI to

RPMI was not a commercially reasonable disposition under 13 Pa.C.S.A. § 9610(b)

---

[13]  Mr. Fuscaldo testified at his September 5, 2023 deposition as follows:

> Q. I want to talk to you about your understanding of the membership interest in TIL.  Do you know if a membership interest in TIL has ever been sold on a public market?

> A.  Do I know that?

> Q.  Yeah.  Do you know or are you aware of any sale of a membership interest in TIL on a public market?

> A.  I'm not aware.

> Q.  Is there any reason to believe it's ever been sold on a public market?

> A.  I don't know of any.

> Q.  Do you know if there is a publicly available history of its buy and sell price?

> A.  No.

> Q.  Has the - - has a membership interest in TIL ever been the subject of standard price quotations like you see on the Stock Exchange?

> A.  I don't think so.

> Q.  Has a membership interest in TIL otherwise been publicly valued in any way that you are aware?

> A.  No.

See Transcript of September 5, 2023 Deposition at pp. 66-67, Exhibit 24 to the *Amended Verified Complaint* (ECF No. 24-24).

-19-

because (1) notice allegedly was not adequately provided to each of Purlin 5 (as the purported owner of the membership interests in TIL) and Purlin 4 (as a secured creditor having a competing lien against the membership interests in TIL), (2) the Purlin Entities were not provided with notice of the specific date and time of the private disposition,[14] (3) the sale was not conducted at arms-length since RPMI was the only bidder for the sale of the collateral and did not use reasonable efforts to maximize the proceeds of the sale, and (4) there was no opportunity for competitive bidding and the price paid by RPMI was unreasonably low at a mere $10.[15]

---

[14]  Mr. Fuscaldo testified that RPMI never provided notice of the foreclosure sale to the Purlin Entities. See Transcript of September 5, 2023 Deposition at pp. 36-37 and 40, Exhibit 24 to the *Amended Verified Complaint* (ECF No. 24-24). Mr. Fuscaldo also testified as follows:

Q.  Okay.  So who had notice that the actual foreclosure, purported foreclosure - - excuse me - - was going to occur on July 31st?

A.  No one else.  It was a private sale.

Q.  Did you - -

A.  It was a private sale.  It wasn't a public sale.

Q.  So it was just you and the notary?

A.  Correct.  That's why it's private.

Q.  And I take it then that only you and the notary knew the location of the purported foreclosure as well.

A.  It was private.  Yes.

See id. at p. 62.

[15]  The case of 395 Lampe, LLC v. Kawish, LLC, Case No. C12-1503RAJ, 2016 WL 1449205 (W.D. Wash. Apr. 12, 2016) contains an interesting discussion of commercial reasonableness in the context of an Article 9 public sale of membership interests in an LLC.  In 395 Lampe, LLC, the public disposition (whereby the credit bid of the lender was the prevailing bid) was found by the court to be commercially reasonable when (1) the auction was publicly advertised, (2) nearly 200 prospects were solicited or sought additional information, (3) prospective bidders

(continued...)

The Purlin Entities have also alleged that the July 31, 2023 private sale is void because RPMI allegedly agreed to release its alleged lien against the membership interests in TIL pursuant to the purported lien release agreements described above.  Alternatively, the Purlin Entities have alleged that Purlin 5's re-constituting TIL as part of its exercise of "corporate hygiene" effectively eliminated any interests that RPMI may have had against the membership interests in TIL.[16]

After the July 31, 2023 private sale, United States District Judge Nicholas J. Ranjan referred the Removed Action to this Court given the fact that the Purlin Entities questioned whether this case or controversy fell within the bankruptcy jurisdiction of this Court.  Judge Ranjan instructed: "Because [the] jurisdictional issue turns on possible interpretation of the bankruptcy court's orders, the Court finds that the bankruptcy court is in the best position to consider whether federal jurisdiction exists, and if it does, to then adjudicate this case." See ECF No. 9.

Thereafter, the Court conducted several hearings and authorized the parties

---

[15](...continued)
were permitted to participate in the auction so long as they signed nondisclosure and confidentiality agreements, and (4) the credit bid approximated what the court had previously found the assets to be worth. Id. at *4-*5, and n. 6.  As to the latter point, the court observed: "[e]ven if the [secured party] could have fetched a better price through some other hypothetical sale . . . that alone does not show that the sale was conducted in a commercially unreasonable manner." Id. at *5; see also In re Adobe Trucking, Inc., 551 Fed.Appx 167, 174 (5th Cir. 2014)(sale was commercially reasonable where secured creditor used a $41 million credit bid at a public sale to purchase collateral asserted to be worth $81 million).

[16]     Absent some sort of subsequent lien release agreement, RPMI's rights were expressly preserved by operation of both the Confirmation Order and the agreement reached at the December 6, 2022 confirmation hearing. RPMI contends that the "corporate hygiene" conducted by Purlin 2 (to essentially re-constitute TIL, assign the TIL membership interests to Purlin 5, and to further lien the TIL membership interests in favor of Purlin 4) was ineffectual given the rights accorded to RPMI under its *Pledge Agreement*.  The Court need not recite all of RPMI's rights under the *Pledge Agreement* at the present time and offers no opinion on the efficacy of them, but notes that Purlin 2 and Arena knew or should have known of the terms of the *Pledge Agreement* at or before the December 6, 2022 confirmation hearing because the *Pledge Agreement* was part of the public record in this case and is attached to RPMI's claim at Claim No. 24-1.

to undertake expedited discovery.  As a result of information obtained during expedited discovery, the Purlin Entities have filed their *Amended Verified Complaint*, which added several additional defendants to this action.

As presently written, the *Amended Verified Complaint* seeks (1) a declaration that RPMI holds no valid lien against the membership interests in TIL because it has been waived and extinguished, or alternatively that RPMI's alleged un-perfected interest is junior to Purlin 4's perfected interest under applicable non-bankruptcy law,[17] (2) a declaration that the private foreclosure sale by RPMI is invalid and without effect under applicable non-bankruptcy law, (3) to the extent that the private foreclosure sale conducted by RPMI is invalid, the entry of an order "unwinding" the sale, (4) damages under 13 Pa. C.S.A. § 9625 and the common law of conversion, and (5)  a finding that RPMI is in contempt of Judge Ward's alleged standstill directive, and awarding the Purlin Entities attorney's fees, investigation fees, deposition fees, and all other disbursements necessitated by RPMI's noncompliance of the same.

## II.

Turning to the issue of jurisdiction, the United States Supreme Court has

---

[17]  Absent a valid "opt-in" to Article 8 of the UCC by TIL, it appears that Purlin 4 did not perfect its lien interest in the re-issued TIL membership interests until it filed its Article 9 UCC financing statement on September 8, 2023– which is subsequent to the date in which RPMI conducted the private foreclosure sale of the disputed membership interests in TIL.  This chronology begs the question as to whether there was anything for Purlin 4 to perfect when it filed its September 8, 2023 financing statement?  <u>See</u> 13 Pa.C.S.A. § 9308(a)(providing that perfection occurs when you have attachment and requirements for perfection are met).  Conversely, to the extent Purlin 2's "corporate hygiene" was appropriate under applicable state law, the "flip side of the coin" is the question of whether there was actually anything in existence for RPMI to foreclose upon when it conducted the private sale? The Court offers no opinion on these matters, either positively or negatively.

held that this Nation's bankruptcy courts are courts of limited subject-matter jurisdiction. Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995)("jurisdiction of the bankruptcy courts like that of other federal courts, is grounded in, and limited by, statute"); In re Poplar Run Five, Ltd., 192 B.R. 848, 854 (Bankr. E.D. Va. 1995)(citing Canal Corp. v. Finnman (In re Johnson), 960 F.2d 396, 399 (4th Cir. 1992)). According to the United States Supreme Court: "It is to be presumed that a cause lies outside [of a federal courts'] limited jurisdiction and the burden of establishing the contrary rests with the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)(citations omitted).

As a result, bankruptcy courts "must be alert to avoid overstepping their limited grants of jurisdiction." In re Poplar Rune Five Ltd., 192 B.R. at 854-55 (quoting McCorkle v. First Pa. Banking Trust Co., 459 F.2d 243, 244 n. 1 (4th Cir. 1972)).

It has been held that the window of opportunity to litigate claims and causes of action before a bankruptcy court diminishes once a chapter 11 debtor confirms a plan of reorganization. Jeffrey L. Miller Invs., Inc. v. Premier Realty Advisers, LLC (In re Jeffery L. Miller Invs., Inc.), 624 B.R. 913, 916 (Bankr. M.D. Fla. 2021) As one court wrote:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. . . . Formerly a ward of the court, the debtor is emancipated by the plan of

reorganization.

<u>Pettibone Corp. v. Easley</u>, 935 F.2d 120, 122 (7th Cir. 1991)(opinion by

Easterbrook, J.).  Similarly, courts have also written:

> We have had occasion before to deplore the tendency of
> District Courts to keep reorganized concerns in tutelage
> indefinitely by orders purporting to retain jurisdiction for
> a variety of purposes, extending from complete
> supervision of the new business to modifications of detail
> in the reorganization.    Since the purpose of
> reorganization clearly is to rehabilitate . . .  and start off
> on a new and to-be-hoped-for more successful career, it
> should be the objective of courts to cast off as quickly as
> possible all leading strings which may limit and hamper
> its activities and throw doubt upon its responsibility.  It
> is not consonant with the purposes of the Act, or feasible
> as a judicial function, for the courts to assume to
> supervise a [debtor] somewhat indefinitely.

<u>In re Jeffrey L. Miller Investments, Inc.</u>, 624 B.R. at 919 (quoting <u>N. Am. Car Corp.</u>

<u>v. Peerless Weighing & Vending Mach. Corp.</u>, 143 F.2d 938, 940 (2nd Cir. 1944)).

Against this backdrop, the issue before the Court is whether the causes of

action asserted by the Purlin Entities in the Removed Action fall within the

subject-matter jurisdiction of this Court.  The answer to this question turns on

the contours of the jurisdiction bestowed by Congress upon United States

Bankruptcy Courts as units of the United States District Courts.

The source of the bankruptcy court's jurisdiction is not found in the

Bankruptcy Code itself.  <u>See</u>, <u>e.g.</u>, <u>In re Combustion Eng'g, Inc.</u>, 391 F.3d 190,

224, 225 (3rd Cir.2004) (where the court held that "§ 105 does not provide an

independent source of federal subject matter jurisdiction").

Nor is the source of the bankruptcy court's jurisdiction found in the express terms of a confirmed plan of reorganization. See ACandS Asbestos Settlement Trust et al. v. Trafelet (In re ACandS, Inc.), Adv. No. 10-53721, 2011 WL 3471243, at *2 (Bankr. D. Del. Aug. 8, 2011).  In fact, courts have held that  a confirmed plan of reorganization, and any "retention of jurisdiction" provision found it, cannot be used to manufacture jurisdiction. Binder v. Price Waterhouse & Co. (In re Resorts Int'l), 372 F.3d 154, 161 (3rd Cir. 2004)("neither the bankruptcy court nor the parties can write their own jurisdictional ticket"); Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 164 (7th Cir. 1994)("orders approving [a] bankruptcy sale [or] . . . plan of reorganization . . . [cannot] confer jurisdiction.  A court cannot write its own jurisdictional ticket").  As one court wrote:

> While it is true that the debtor's plan must retain jurisdiction over a claim for the debtor to later assert it, the Defendants' argument puts the cart before the horse. A retention-of-jurisdiction plan provision can only be given effect if there is subject-matter jurisdiction over a dispute in the first place.  Where a court lacks subject-matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.

In re Jeffrey L. Miller Invs., Inc., 624 B.R. at 916 (quotations and footnotes omitted).

The statutory source of bankruptcy court jurisdiction is contained within 28 U.S.C. §§ 157 and 1334. See U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.), 301 F.3d 296, 303 (5th Cir. 2002) and United States Tr. v. Gryphon at the Stone Mansion, Inc., 216 B.R. 764, 769 (Bankr. W.D. Pa. 1997,

aff'd, 166 F.3d 552 (3rd Cir. 1999).[18]

These statutes provide that the bankruptcy court has jurisdiction over four types of title 11 matters : (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11. In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 264 (3rd Cir. 1991)(citations omitted). See also 28 U.S.C. §§ 157(a), 1334(a), and 1334(b).

The phrase "cases under title 11" merely refers to the bankruptcy petition itself. In re Marcus Hook. Dev. Park, Inc., 943 F.3d at 264.  Because the *Amended Verified Complaint* does not involve or challenge Mr. D'Angelo's bankruptcy petition, this grant of subject-matter jurisdiction has no application to the dispute presently before the Court.

The remaining three grants of jurisdiction under the applicable statutes concern "proceedings" that "arise under" title 11, "arise in" a case under title 11, or "relate to" a case under title 11.

A "proceeding" has been construed to mean bankruptcy litigation in its "broadest sense," and includes anything that occurs within a case. In re U.S.

---

[18]  The jurisdictional map is actually more complicated.  Bankruptcy jurisdiction is substantively and technically given to the District Court, which in-turn refers cases and proceedings to the Bankruptcy Court by way of an order of reference. In re Marcus Hook Dev. Park, Inc., 943 F.2d at 264 n.3;Mesabil Metallics Company, LLC v. B. Riley FBR, Inc. (In re Essar Steel Minnesota, LLC), 47 F.4th 193, 197-98 (3rd Cir. 2022)(describing the intricacies of the original bankruptcy jurisdiction of the district courts, and referral of bankruptcy matters to bankruptcy courts as units or adjuncts of the district courts); see also 28 U.S.C. §§ 157(a) and 157(b) and the *Standing Order of Reference* issued by the United States District Court for the Western District of Pennsylvania on October 16, 1984 found at https://www.pawd.uscourts.gov/sites/pawd/files/general-orders/bankruptcy_standing_order.pdf. .

Brass Corp., 301 F.3d at 303, n. 14.    As one court observed, "[t]he term 'proceeding' as used in 28 U.S.C. § 1334(b) refers 'to the steps within the case that may raise a disputed or litigated matter.'" Gupta v. Quincy Med. Ctr., 858 F.3d 657, 661 n. 3 (1st Cir. 2017)(quoting Mich. Emp't Sec. Comm'n v. Wolverine Radio Cor. (In re Wolverine Radio Co.), 930 F.2d 1132, 1141 n. 14 (6th Cir. 1991)).

Of course, to restate the obvious, the broad construction of the word "proceeding" is limited by types of proceedings set forth in the statutes.  This means only those "proceedings" that "arise under title 11," "arise in a case under title 11," and/or "relate to a case under title 11" are jurisdictionally sound to be heard and decided by the bankruptcy court.

The words "arising under title 11 " means "only those cases in which a well-pleaded complaint establishes either that federal [bankruptcy] law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal [bankruptcy] law." In re Poplar Run Five Ltd. 192 B.R. at 855 (quoting Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 27-28 (1983)).

Against this standard, the Court concludes that the *Amended Verified Complaint* does not invoke the "arising under title '11" basis of bankruptcy court jurisdiction because the claims asserted by the Purlin Entities are not grounded in any provision of title 11.  Rather, the claims asserted by the Purlin Entities are state law claims for conversion, wrongful foreclosure of Article 9 of the Uniform Commercial Code, and contempt of an alleged order of the Court of Common Pleas

of Allegheny County, Pennsylvania.

In reaching this conclusion, the Court has duly considered 11 U.S.C. § 1142, which directs that "the debtor" shall "carry out the plan and shall comply with any orders of the court." <u>See</u> 11 U.S.C. § 1142(a).  This statute also states that the "court may direct . . . any other necessary party to execute or deliver . . . any instrument required to effect a transfer of property dealt with by a confirmed plan[.]" <u>See</u> 11 U.S.C. § 1142(b).

However, section 1142's "language does not confer any substantive rights on a party apart from whatever the plan provides." <u>In re J&B Haldeman Holdings, LLC</u>, 517 B.R. 910, 917 (Bankr. W.D. Wisc. 2014)(quoting <u>Village of Rosemont v. Jaffe</u>, 482 F.3d 926, 935 (7th Cir. 2007)).  Instead, section 1142 "empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan." <u>Id</u>.

What is readily apparent by the record made in this adversary proceeding is that section 1142 has absolutely no application to the case at hand because there is no dispute that the debtor carried out his obligation to convey his interests in TIL, subject to RPMI's rights, to Purlin 2.  In fact, both counsel to RPMI and the Purlin Entities acknowledged as much at the September 8, 2023 hearing on this matter.

For instance, counsel to RPMI stated to the Court: "[T]he bottom line is RPMI has a security interest . . . in the membership interests.  Those membership interests were assigned to Purlin . . ..  They took it subject to the security interests [of RPMI]." <u>See</u> *September 8, 2023 Transcript* at p. 8, ECF No. 21.  Similarly,

counsel for the Purlin Entities acknowledged that the TIL interests were transferred by Mr. and Mrs. D'Angelo pursuant to the confirmed plan to Purlin 2 "subject to the existing claims or rights" of RPMI. Id. at pp. 46-47

A fair reading of the record is that the dispute at hand is actually whether (1) the post-confirmation conveyance from Purlin 2 to Purlin 5 was effective without notice or consent of RPMI, (2) whether the post-confirmation "corporate hygiene" completed by Purlin 2 washed away RPMI's lien interest against the membership interests in TIL, (3) whether RPMI's post-confirmation private foreclosure sale complied with applicable law, and (4) whether RPMI's post-confirmation private foreclosure violated an order of Judge Christine Ward of the Court of Common Pleas of Allegheny County.  None of these disputes "arise under title 11."  Rather, they arise under state law and exist independently of this bankruptcy case (and the Bankruptcy Code).

Similarly, a fair reading of the dispute at hand is whether, post-confirmation of the *Amended Plan*, RPMI and the Purlin Entities entered into one or more lien release agreements as alleged by the Purlin Entities?

While this is an interesting question, especially in light of the emails attached to the Purlin Entities' amended complaint, the undisputed record remains that these alleged lien release agreements (1) occurred after this Court confirmed the *Amended Plan* which provided for the assignment of the TIL membership interests to Purlin 2, and (2) were never approved or brought before this Court for approval.  Therefore, these lien release agreements (if they do in-fact

exist) have nothing to do with Mr. D'Angelo's implementation of his plan. Rather, these disputed transactions concern only Purlin 2's ***later disposition*** of the assets it duly acquired.

As such, any inference or suggestion that 11 U.S.C. § 1142 has application or relevance to the present dispute is mistaken. See Jackson Masonry v. Ritzen Grp., Inc. (In re Jackson Masonry), Adversary No. 17-90157, 2018 WL 1636085, at *4-*5 (Bankr. M.D. Tenn. April 3, 2018)(bankruptcy court could not utilize section 1142 of the bankruptcy code to provide relief beyond what is provided for in the confirmed plan).

Nor can it be said that these disputes "arise in" a case under title 11. The key to ascertaining "arising in" jurisdiction is to ask whether the proceeding "by [its] nature, not [its] particular factual circumstance, could ***only*** arise in the context of a bankruptcy case." Stoe v. Flaherty, 436 F.3d 209, 218 (3rd Cir. 2006)(citing Halper v. Halper, 164 F.3d 830, 836 (3rd Cir. 1999)(emphasis added).

Clearly, the dispute at the heart of the Removed Action is one that does not necessarily arise solely in the context of a bankruptcy case. Rather, the gist of this lawsuit is that it is a state law property dispute.

The circumstances of this case even admits to the conclusion that the causes of action do not necessarily arise solely in the context of a bankruptcy case. That is, the transactions which are at the heart of the controversy are several steps removed from Mr. D'Angelo's bankruptcy and therefore are outside of the subject-matter jurisdiction of this Court. See In re Hall's Motor Transit Co.,

889 F.2d 520, 522 (3rd Cir. 1989)("jurisdiction does not follow the property, but rather, lapses when the property leaves the debtor's estate"); accord In re Marcus Hook Dev. Park, Inc., 943 F.2d at 265-66.

For example, RPMI's post-confirmation private foreclosure tests the efficacy of the rights afforded to RPMI under its *Pledge Agreement* governing the TIL membership interests pledged by Mr. & Mrs. D'Angelo.  RPMI's post-confirmation private foreclosure also challenges the efficacy of the post-confirmation "corporate hygiene" completed by Purlin 2 (including the assignment of the TIL membership interests from Purlin 2 to Purlin 5).  RPMI's disputed foreclosure further tests the *bona fides* of the pledge of the of the re-issued membership interests in TIL by Purlin 5 to Purlin 4.  It further draws into question the alleged lien release agreements which the Purlin Entities contend were entered into by the Purlin Entities and RPMI after plan confirmation and outside of the confines of any order of this Court.[19]

All of these items of contention are matters of state law, which weave together claims having their basis under Article 9 of the UCC, corporate law relating to governance of a limited liability company, and state contract law. These sort of claims are in no way limited or tied to the existence of a predicate bankruptcy case.

Not to be lost in this discussion is the fact that courts have held: "The fact

---

[19]  See Fed.R.Bankr.P. 9019 (requiring bankruptcy settlements to be approved by an order of the bankruptcy court).

that property was once owned by a bankrupt does not supply federal jurisdiction [to] all future disputes concerning the property... [O]nce property is sold, further disputes have nothing to do with the debtor's estate." <u>Miller v. Kemira, Inc. (In the Matter of Lemco Gypsum, Inc.)</u>, 910 F.2d 784 , 789(11th Cir. 1990); <u>see also</u> <u>In re Hall's Motor Transit Co.</u>, 889 F.2d at 522-23 (opinion by Mansmann, J.)(holding that contending otherwise is "insubstantial and frivolous").

In <u>Hall's Motor Transit</u>, the bankruptcy court approved the sale of the debtor's motor freight terminal, and after the sale closed the purchaser re-conveyed the motor freight terminal to a third party. In between closing of the first sale and the re-conveyance, local zoning laws applicable to the property were made more restrictive thus leading to condemnation proceedings by the local municipality. The party who received the re-conveyance pursued redress in the courts, which included asking that the bankruptcy court enter declaratory and injunctive relief barring the municipality from interfering with the purchaser's use and enjoyment of the property. The action was ultimately dismissed for want of subject-matter jurisdiction, which the 3rd Circuit Court of Appeals affirmed. In support of its decision, the court in <u>Hall's Motor Transit</u> held:

> . . . The bankruptcy court's jurisdiction does not follow the property, but rather, it lapses when the property leaves the debtor's estate. <u>Matter of Xonics, Inc.</u>, 813 F.2d 127, 131 (7th Cir.1987)...
>
> . . . [W]e must reject [the purchaser's] argument that the district court had jurisdiction over the matter pursuant to 28 U.S.C.A. § 1331 because bankruptcy is a federal matter and district courts have jurisdiction over

questions of federal law. [Purchaser] contends that the issue involves bankruptcy law because of the application of the automatic stay provision found at 11 U.S.C.A. § 362(a) to the rezoning ordinance. If this suit was being brought by [the debtor] while still in possession of the property, the matter would fall within the jurisdiction of the district court as a bankruptcy matter. However, as noted above, when the terminal left the estate of the debtor and became the property of [the purchaser], its relation to the bankruptcy proceedings was at an end. Cf. Matter of Xonics, 813 F.2d 127 (7th Cir.1987). "Otherwise any one who could trace his title to a bankrupt would invoke federal jurisdiction to settle disputes affecting that property." 813 F.2d at 131. Since there is no relation to the bankruptcy proceedings, 28 U.S.C.A. § 1334 does not afford jurisdiction. [Purchaser] contends that there is jurisdiction under 28 U.S.C.A. § 1331 because it claims that 11 U.S.C.A. § 362 provides it with a cause of action to challenge the [municipality's] zoning ordinance. We hold that this contention is so wholly insubstantial and frivolous that it will not support jurisdiction under § 1331. Hagans v. Lavine, 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974); see also Jackson v. O'Bannon, 633 F.2d 329, 331 n. 1 (3d Cir.1980); Williams v. Wohlgemuth, 540 F.2d 163, 166 (3d Cir.1976). Consequently, we will affirm the district court's dismissal of the suit and its order vacating the TRO for lack of subject matter jurisdiction.

In re Hall's Motor Transit Co., 889 F.2d at 522-23

Similarly, in Lemco Gypsum, the bankruptcy court authorized the sale of estate assets to a buyer. Assets were located on land owned by a third-party. The initial sale order entered by the court required the buyer to remove the property from the land within 60 days. This initial order was then superceded by a subsequent order that confirmed the sale to the buyer without any reference to the 60 day removal requirements. No party objected to the entry of this

subsequent order, and the buyer failed to remove the assets within 60 days of the

order confirming the sale.  Contempt proceedings were then filed by the landowner

against the purchaser to enforce a 60 day removal requirements and for damages

for violation of the same.  In the course of reversing the bankruptcy court and

district court's imposition of civil contempt sanctions, the 11th Circuit Court of

Appeals found that the cause of action asserted by the landowner fell outside the

federal court's jurisdiction.  In support of its decision, the 11th Circuit held:

> As noted by the Seventh Circuit in Matter of Chicago,
> Rock Island & Pac. R.R. Co., [794 F.2d 1182, 1186 (7th
> Cir. 1986)]the presence of a federal right or decision in
> the chain of title is insufficient to confer jurisdiction on
> a federal court.  Only when federal law supplies the rule
> of decision, or an interpretation of a federal right is an
> essential ingredient of a claim, does the dispute present
> a federal question.   New disputes arising after the
> property has been sold by the trustee to a third party
> must be resolved through processes available for
> resolution of such independent disputes.   In other
> words, this dispute is about rights incident to the
> ownership of real property, a question of state law.  Such
> disputes should be decided by a state court; state law
> supplies the rule of decision for disputes concerning
> property transferred from bankrupts.

Lemco Gypsum, 910 F.2d at 789 (footnotes omitted).

Other courts have reached the same conclusion.  For example, in In re Ray,

the debtor obtained a sale order authorizing him to sell jointly owned property to

a third-party.  The asset was subject to the right of first-refusal held by the

plaintiff.  After the sale closed, the beneficiary of the right of first refusal brought

an action in state court to enforce its rights.  After the case was removed, the

bankruptcy court proceeded with jurisdiction over the matter.  Ultimately, the 9th

Circuit Court of Appeals disagreed with the bankruptcy court's jurisdictional

findings and concluded:

> Here, [the plaintiff's] claim for breach of contract arising
> out of Sellers' purported failure to comply with the right
> of first refusal does not, by its nature arise only in the
> context of a bankruptcy case.  A matter arises under the
> Bankruptcy Code if its existence depends on a
> substantive provision of bankruptcy law.  Because the
> theory of its claim is a state law contract, [the plaintiff's]
> claim against the Sellers is not one arising under the
> Bankruptcy Code.

In re Ray, 624 F.3d at 1124, 1131 (9th Cir. 2010)(quotations and citations

omitted).

The decision by the 1st Circuit Court of Appeals in Gupta v. Quincy Medical

Center is consistent with the holdings of Hall's Motor Transit, Lemco Gypsum and

Ray.  In Gupta, employees who were terminated upon the sale of the debtor's

assets sought relief from the bankruptcy court to enforce the provisions of an

asset purchase agreement (which was approved by the court pursuant to a

bankruptcy sale). The conduct of the purchaser which is alleged to have violated

the asset purchase agreement occurred post-sale. In assessing the bankruptcy

court's jurisdiction to adjudicate such a matter, the Gupta court observed that

while applicable orders may provide for the retention of bankruptcy court

jurisdiction, retention-of-jurisdiction clauses are only effective if there is

jurisdiction to retain. Gupta, at 664 (quoting Valley Historic Ltd. P'ship. v. Bank

of N.Y., 486 F.3d 831, 837 (4th Cir. 2007)).  Thus, jurisdiction would depend on

whether the proceeding was one that arises under title 11, or arises in or is related to cases under title 11. <u>See</u> 28 U.S.C. § 1334(b).

In determining whether jurisdiction under 28 U.S.C. § 1334 existed, the First Circuit in <u>Gubta</u> observed that the matter did not invoke "arising under" or "related to" jurisdiction because the cause of action was rooted in state contract law, as opposed to the Bankruptcy Code, and the proceeding would have "no conceivable impact upon [the debtor's] bankruptcy estate. <u>Gupta</u>, at 664.

Further, the First Circuit in <u>Gupta</u> rejected the position that the proceeding "arose in" a bankruptcy case merely because the asset purchase agreement was approved by the bankruptcy court under the sale provisions of 11 U.S.C. §§ 363 and 365 and that such order may "only be issued by a bankruptcy court." <u>Id</u>. (quoting <u>New England Power & Marine, Inc. v. Town of Tyngsborough, Mass. (In re  Middlesex Power Equip. & Marine, Inc.)</u>, 292 F.3d 61, 68-69 (1st  Cir. 2002)). In other words, the court in <u>Gupta</u> was not convinced that "but for" the bankruptcy case and sale order, the claims could not independently exist. <u>Gupta</u> at 664.   Rather, the <u>Gubta</u> court noted that employee state-law claims may arise in sales outside of a bankruptcy context and therefore "arising in" bankruptcy jurisdiction was absent. <u>Id</u>. at 665.

The court in <u>Gupta</u> elaborated that it is insufficient that a claim merely arise in the context of a bankruptcy case for subject-matter jurisdiction to attach; instead "arising in" jurisdiction requires that the proceeding have absolutely "no existence outside of the bankruptcy." <u>Id</u>. (quoting <u>New England Power & Marine,</u>

Inc. v. Town of Tyngsborough, Mass. (In re Middlesex Power Equip. & Marine, Inc.), 292 F.3d 61, 68 (1st Cir. 2002)(citations omitted)).  Since the dispute in Gupta did not implicate the terms of the sale order itself, were governed by state contract law, and appeared to be employment disputes that could arise in conjunction with any asset sale (whether in bankruptcy or outside of it), the causes of action at issue were not claims which "arise in" a bankruptcy case.

The cases of Hall's Motor Transit, Lemco Gypsum, Ray, and Gupta are analogous to the controversy sub judice.  That is, assets (i.e., the membership interests in TIL) were conveyed from the bankruptcy estate to  Purlin 2 subject to claims and interests of third-parties like RPMI, and the membership interests in TIL were then re-conveyed by Purlin 2 to Purlin 5 as a result of post-confirmation "corporate hygiene."  Neither this Court's Confirmation Order, nor any provision of the Bankruptcy Code, provides for this Court's subject-matter jurisdiction to "follow the property."[20]

---

[20]   The circumstances surrounding the matters complained of in the *Amended Verified Complaint* stand in contrast to the case of In re Terracor, 86 B.R. 671 (Bankr. D. Utah 1988), where the confirmed plan required that the debtor not only transfer real property to the debtor's secured creditor, it required a further transfer (or reconveyance) of the property by the secured creditor to a secondary entity.  When the reconveyance did not occur in violation of the plan, the secondary party that was to receive the property filed suit in the bankruptcy court.  The bankruptcy court found that it had jurisdiction to adjudicate the matter since it was an express action to implement the clear terms of the plan under 11 U.S.C. § 1142.  Nonetheless, "in the interest of comity with state courts," the court remanded the lawsuit back to the state court.  Terracor's findings as to enforcement under 11 U.S.C. § 1142 is inapplicable to the case now brought by the Purlin Entities against the Defendants because no plan provision or order in this bankruptcy case provided for, or required, that the interests in TIL be re-conveyed by Purlin 2 to Purlin 5.  In addition, no plan provision or order in this bankruptcy case provided for, or required, that Purlin 4 make a loan to (or for the benefit of) TIL or that Purlin 5 pledge its TIL membership interests to Purlin 4.  Furthermore, no plan provision or order in this bankruptcy case, provided for, or required, that RPMI's lien interest be extinguished or that RPMI is precluded from foreclosing the same under applicable non-bankruptcy law.

The broadest form of bankruptcy jurisdiction is "related to" jurisdiction.

The Third Circuit Court of Appeals has held:

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* . . . Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

Pacor v. Higgins, 743 F.2d 984, 994 (3rd Cir. 1984), overruled on other grounds by

Things Remembered v. Petrarca, 516 U.S. 124 (1995)(emphasis in original; citations omitted).

Because the bankruptcy estate ceases to exist upon plan confirmation, see 11 U.S.C. § 1141(b), this technicality curtails the expansive nature of the so-called Pacor Test for "related to" jurisdiction. Nonetheless, the Third Circuit Court of Appeals has noted that it is impractical to apply the Pacor Test so rigidly, and has acknowledged that post-confirmation jurisdiction of the bankruptcy court does exist in limited circumstances. In re Resorts Int'l, 372 F.3d 154, 165 (3rd Cir. 2004).

In the context of ascertaining the existence of post-confirmation bankruptcy jurisdiction, the Third Circuit Court of Appeals has held that: "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter."

<u>Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)</u>, 372 F.3d 154, 166-67 (3rd Cir. 2004); <u>In re ACandS, Inc.</u>, 2011 WL 3471243, at *3 (quoting <u>In re Resorts Int'l, Inc.</u> at 166-67).

A significant factor in this determination is whether the dispute before the Court is one that implicates "the integrity of the bankruptcy process[,]" or whether the dispute is merely "collateral to the bankruptcy case." <u>In re Resorts Int'l, Inc.</u>, at 167 ("In upholding jurisdiction, we found significant the fact that the case did 'not involve a dispute essentially collateral to the bankruptcy case.' Rather, the action 'implicated the integrity of the bankruptcy process' because one party's actions impaired the other party's ability to act in accordance with the plan." (citations omitted)).

In short, for the bankruptcy court to have jurisdiction post-confirmation, the dispute "must affect an integral aspect of the bankruptcy process—there must be a close nexus to the bankruptcy plan or proceeding." <u>Id</u>. at 167.

One consideration in determining post-confirmation jurisdiction is whether the Court must interpret a plan or plan documents to resolve the dispute. <u>In re ACandS, Inc.</u>, 2011 WL 3471243, at *3. The answer in the instant case is that it is unnecessary to interpret Mr. D'Angelo's plan or plan documents to resolve the dispute between the Purlin Entities and RPMI because both parties concede that, pursuant to the Confirmation Order, Purlin 2 acquired the membership interests in TIL "subject to" the claims and interests of third-parties.

Thus, resolution of the present dispute asks that this Court hear and decide matters outside the boundaries of the Confirmation Order and assess not only the *bona fides* of liens against the TIL membership interests (which are no longer property of the estate and/or Mr. & Mrs. D'Angelo), but also the rights and obligations of non-debtor parties as a result of alleged lien release agreements which occurred post-confirmation and outside of the purview of this Court.

Similarly, the dispute set forth in the Removed Action will not "have any effect on the implementation, execution, or administration of the confirmed plan." In re ACandS, Inc., at *3. By the *Amended Verified Complaint*, the Purlin Entities are not seeking to enforce the confirmed plan's requirement that the membership interests in TIL be transferred to Purlin 2—that has already been done as the parties have acknowledged. What is at issue is the validity of post-confirmation transactions taken by non-debtor entities (i.e., the transfer of the TIL interests to Purlin 5, the pledging of those interests by Purlin 5 to Purlin 4, and the purported private foreclosure of them by RPMI) which will have absolutely no bearing on whether the terms of the *Amended Plan* have been satisfied.

Moreover, this dispute will have no effect on the debtor (Mr. D'Angelo), since no matter who prevails in the Removed Action the transfer of the D'Angelo's membership interest in TIL will not be set aside. "Nor will the dispute affect the debtor's estate, which no longer exists[,]" as the bankruptcy estate ceased to exist upon plan confirmation as a matter of law. Id.; 11 U.S.C. § 1141(b).

In light of these observations, it is apparent that this dispute does not affect an integral aspect of the bankruptcy process, and is instead, is entirely collateral to the bankruptcy case. Thus, there is no "close nexus" by which this Court could assert "related to" jurisdiction.

Of course, it is obvious to recognize that this Court has jurisdiction to interpret and enforce its own orders. See, e.g., Travelers Indem. Co., 557 U.S. at 151.[21] The Third Circuit Court of Appeals has even held that not only is the enforcement and construction of a confirmation order a "core" proceeding, Essar, 47 F.4th at 199, the "close nexus test" does not extend to core proceedings. Id. at 198.

The existence of these sorts of "core proceedings" where prior orders are "clarified" or "interpreted," does not automatically cloak all controversies with the limited jurisdictional aura of the bankruptcy courts. As the Third Circuit has noted: "We likewise note that we do not hold that post-confirmation plan and order disputes are *per se* core proceedings that confer bankruptcy jurisdiction. Rather, whether a proceeding is core should be decided on a case-by-case basis..." Essar Steel, 47 F.4th at 200 n. 7.

It is this Court's conclusion that, despite the Court's inherent authority to interpret and enforce its prior orders, this Court lacks the requisite subject-matter jurisdiction to hear and decide the Removed Action. This Court has reviewed the

---

[21] In other words, a court always has jurisdiction to issue a "clarifying" order. Essar Steel, 47 F.4th at 201 (citing Travelers, 557 U.S. at 151).

Confirmation Order and related record, and concludes that the terms of the Confirmation Order are not ambiguous, are not actually disputed by the parties, and do not in any fashion govern the outcome of the Removed Action–- which is simply a state law based property dispute that was commenced in state court.

The fact that RPMI asks that the Court examine prior orders and other elements of the record in this bankruptcy case– each of which are not outcome determinative to the Removed Action– simply cannot form an adequate hook to catch a jurisdictional whale.[22]  Remand of the Removed Action is therefore appropriate due to want of proper subject-matter jurisdiction.

### III.

Even if this Court has subject-matter jurisdiction to hear and decide the Removed Action, the Court finds there are also equitable reasons to remand this adversary proceeding to the Court of Common Pleas of Allegheny County, Pennsylvania.

In support of removal, RPMI cites to 28 U.S.C. § 1452(a), which governs the removal of claims to federal court that are related to bankruptcy cases. See *Notice of Removal* ¶18, ECF No. 1.

---

[22]  No party has adequately presented a basis for this Court having "ancillary" jurisdiction over the Removed Action.  Inasmuch as this case does not present a controversy warranting the Court to "vindicate its authority and effectuate its decrees," the Court sees no basis of ancillary jurisdiction. In re Ray, 624 F.3d at 1135 (citing Sea Hawk Seafoods, Inc. v. Alaska (In re Valdez Fisheries Dev. Ass'n, Inc.), 439 F.3d 545, 549 (9th Cir. 2006) and Kokkonem, 511 U.S. at 379-80).

Subsection (b) of section 1452 provides: "The court to which such claim or cause of action is removed may remand such claim or cause of action on *any equitable ground*." 28 U.S.C. § 1452(b) (emphasis added).

An "equitable ground" is one that is 'fair and reasonable.'" <u>In re Briarpatch Film Corp.</u>, 281 B.R. 820, 828 (Bankr. S.D.N.Y. 2002) (quoting <u>In re Cathedral of the Incarnation in the Diocese of Long Island</u>, 99 F.3d 66, 69 (2nd Cir. 1996)).

Federal courts consider a variety of factors when considering whether equitable grounds exist to remand a case or controversy.  These factors include: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed parties. <u>In re Briarpatch Film Corp.</u>, 281 B.R. 828–29 (citing <u>Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.</u>, 130 B.R. 405, 407 (S.D.N.Y. 1991)); <u>accord</u> <u>Hohl v. Bastian</u>, 279 B.R. 165, 179–180 (W.D. Pa. 2002)(Ambrose, J.).

All of these factors are present in this case and support a remand of the Removed Action to the Court of Common Pleas of Allegheny County, Pennsylvania. Each of them are discussed *ad seriatum* below.

*Impact on the efficient administration of the bankruptcy estate*: As explained above, this Court confirmed a plan of reorganization in Mr. D'Angelo's chapter 11 bankruptcy by way of entry of the Confirmation Order on December 13, 2022. <u>See</u>

*Order Confirming Debtors First Amended Chapter 11 Plan of Reorganization Dated May 4, 2022*, ECF No. 585. When that happened, Mr. D'Angelo's bankruptcy estate ceased to exist. See 11 U.S.C. § 1141(b). Since Mr. D'Angelo's bankruptcy estate no longer exists, the dispute between the Purlin Entities and the Defendants can have no effect on the administration of the bankruptcy estate.

*The extent to which state law issues predominate*: The *Amended Verified Complaint* that is the subject of the Removed Action asserts a myriad of state law including claims for conversion, wrongful foreclosure violative of Article 9 of the UCC, and alleged contempt of an order that Judge Ward allegedly issued. The state law issues that form the basis of these claims more than predominate the *Amended Verified Complaint*– they are the entire action.

*The difficulty or unsettled nature of the applicable state law*: The state law issues involved are difficult and nuanced. That difficulty includes dissecting the so-called "corporate hygiene" of TIL, deciding the propriety of RPMI's private foreclosure according to Article 9 of the UCC and case law thereunder, and interpreting the alleged "standstill" instruction from Judge Ward. These difficult issues are questions of state law which the Court of Common Pleas is best situated to resolve.

*Comity*:   Comity is a "principle or practice among political entities ... whereby ... judicial acts are mutually recognized." See COMITY, Black's Law Dictionary (11th ed. 2019). This principle requires the Court to recognize the actions that Judge Ward took before RPMI removed this case to federal court. If

Judge Ward ordered the parties to observe a "standstill" until she could hold a hearing on the matter, then Judge Ward is in the best position to enforce her order. If she did not instruct a standstill, then she can say so. It is not equitable for this Court to second-guess and otherwise review the decisions of a state court when those actions have no bearing on the outcome of a bankruptcy case.

*The degree of relatedness or remoteness of the proceeding to the main bankruptcy case*: The Removed Action concerns transactions which occurred after confirmation of Mr. D'Angelo's *Amended Plan* and outside the purview of this Court, and therefore they are "remote" vis-a-vis this bankruptcy case. This conclusion is particularly acute since the assets in question have been re-conveyed by a non-debtor to the non-debtor's affiliate and because this Court's jurisdiction does not follow property that no longer is property of the debtor or his estate.

*The existence of the right to a jury trial:* The *Amended Verified Complaint* is silent on the question of a jury trial and no answer has yet to be filed by any Defendant; nonetheless, if a jury trial is demanded, the bankruptcy court's ability to preside over a jury trial is limited by 28 U.S.C. § 157(e), Fed.R.Bankr.P. 9015, and applicable judicial decisions relating to the necessity of consent of litigants to a non-Article III judge presiding over such trials. However, the Court of Common Pleas of Allegheny County, Pennsylvania is not subject to these limitations and has the requisite jurisdiction to preside over a jury trial. Therefore,

if a jury trial is something that the parties have demanded and are entitled, the Court of Common Pleas is well equipped to facilitate and preside over it.

*The prejudice to the involuntarily removed parties*:. The Court can discern no real prejudice to the Defendants by a remand of the lawsuit to the state court. The Court of Common Pleas of Allegheny County, Pennsylvania is well versed in handling commercial disputes such as this one, and the Defendants will have every defense available to them in that forum.

In summary, since the Removed Action does not effect the administration of this bankruptcy case, is purely a state law action between non-debtors that involves difficult issues of state law, has the gravitational pull of respecting comity (especially since the question of what Judge Ward's directives were prior to RPMI's removal of the lawsuit is germane), concerns transactions that occurred outside of the confines of the bankruptcy proceedings before this Court, and the state court is more than capable of presiding over and timely adjudicating these matters, this Court concludes that the equitable factors in this case warrant a remand of the Removed Action to the Court of Common Pleas of Allegheny County, Pennsylvania.

****

For the reasons set forth above, this Court concludes that the claims and causes of action set forth in the *Amended Verified Complaint* that is the subject of

the Removed Action do not fall within this Court's limited subject-matter jurisdiction.

In addition, the equities compel a remand of this adversary proceeding to the forum where it was commenced.

As such, the Removed Action shall be relieved from the tutelage of this Court and shall be remanded back to the Court of Common Pleas of Allegheny County, Pennsylvania.

An Order consistent with this *Memorandum Opinion* shall be issued.

Date: October 31, 2023

jsf

The Honorable Jeffery A. Deller
United States Bankruptcy Judge

cc:   The Honorable Nicholas J. Ranjan, United States District Judge
      & All Counsel of Record